### FAULKNER v. COMMISSIONER OF INTERNAL REVENUE.

No. 3539.

Circuit Court of Appeals, First Circuit.
June 24, 1940.

988

Robert C. McKay, of Boston, Mass., for petitioner for review.

W. Croft Jennings, of Washington, D. C. (Samuel O. Clark, Jr., Sewall Key, J. Louis Monarch, and S. Dee Hanson, all of Washington, D. C., on the brief), for Commissioner.

Before MAGRUDER and MAHONEY, Circuit Judges, and PETERS, District Judge.

MAGRUDER, Circuit Judge.

This is a petition for review of a decision of the Board of Tax Appeals sustaining the Commissioner's determination of a deficiency in the sum of $3,120 in the petitioner's income tax for the year 1935.

In December, 1935, the petitioner, Mary du P. Faulkner, contributed $6,000 to the Birth Control League of Massachusetts with the understanding that this donation was to be used exclusively for the Mothers' Health Offices operated under the sponsorship of the League. The question presented is whether this contribution was deductible from gross income under section 23(o) (2) of the Revenue Act of 1934, 48 Stat. 680, 690, 26 U.S.C.A.Int.Rev.Acts, page 674, as a gift made "within the taxable year to or for the use of * * * a corporation, or trust, or community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propagan-

da, or otherwise attempting, to influence legislation."

The Birth Control League of Massachusetts was organized as an unincorporated association prior to the First World War. It was inactive during the war but was reorganized in February, 1928. Article II of its constitution as amended June 3, 1935, stated the purposes for which it was organized, as follows:

"The objects of the Birth Control League of Massachusetts shall be:

"Section 1: to collect and correlate information regarding birth control.

"Section 2: to educate the public in the social, economic, and scientific aspects of birth control.

"Section 3: to enlist the support of the public and of lawyers, physicians, and legislators in effecting the liberalization or the repeal or amendment of the existing Massachusetts statutes pertaining to the prevention of conception.

"Section 4: to sponsor the discoveries of the best contraceptive techniques and to sponsor the provision of instruction therein with the advice and under the supervision of the Medical Consultants of the Birth Control League of Massachusetts.

"Section 5: to afford legal protection to physicians affiliated with the Birth Control League of Massachusetts giving contraceptive advice under the interpretation of the law accepted by the Birth Control League of Massachusetts.

"Section 6: to provide advice pertaining to marital relations."

As found by the Board, the principal activities of the League in fact "have consisted of organizing and maintaining Mothers' Health Offices such as the Brookline Mothers' Health Office, in which physicians give contraceptive advice to sick married women unable to afford the fee of a private physician, who, for the most part, were referred to them by hospitals and various welfare agencies". In 1935, when the contribution here involved was made, there were three such Health Offices in Massachusetts, "one in Brookline, one in Springfield, and one in Worcester. Others were later organized".

As bearing on the setting up of these Health Offices the record contains details only with respect to the Brookline Mothers' Health Office, established by the initiative of the Executive Board of the League. A separate "constitution" was adopted.

Article I provides: "The name of this organization shall be the Brookline Mothers' Health Office Committee of the Birth Control League of Massachusetts". Article II states that the object "shall be to provide an office where contraceptive advice may be given under the direction and supervision of the Committee of Supervising Physicians to such women as may be deemed eligible by the Committee of Supervising Physicians". Under Article III the Mothers' Health Office Committee is composed of a chairman appointed by the president of the Birth Control League and various other designated persons including the president and field secretary of the Birth Control League ex officio. The Committee is charged with the task of preparing and submitting a separate budget to the finance committee of the League. Under Article IX, "Agreements with the Birth Control League of Massachusetts", the League agreed to provide legal support for the Mothers' Health Office in any litigation resulting from its activities. The League also agreed to provide financial support for the work of the Mothers' Health Office, and it was further stipulated that "all changes in organization, objectives, and policies of the Mothers' Health Office are subject to the approval of the Executive Board of the Birth Control League".

In a pamphlet entitled "Brookline Mothers' Health Office" its purposes are stated to be:

"To provide an office under skilled medical direction, maintaining the highest medical standards, where contraceptive advice may be given to such women as are deemed eligible by the Committee of Supervising Physicians, in order to:

"Preserve the life and health of mothers.

"Prevent disease.

"Decrease the number of abortions both therapeutic and self-induced.

"Aid the patient in her marital life.

"Improve the health of children by improving the health of their mothers.

"Help patients to space pregnancies when medically indicated."

The petitioner in 1935 was a member of the Executive Committee of the League, and also chairman of the Brookline Mothers' Health Office Committee. Prior to 1935 she had made contributions directly to the Mothers' Health Offices but had never made any substantial contributions to the League. In 1935, however, the campaigns for funds for the League and for the Health Offices were consolidated in the metropolitan area, so that only one appeal would be made to the public for contributions; and the Board found that the petitioner made the $6,000 contribution in question "with the understanding that the funds were to be used for the Health Offices only."

The unchallenged finding of the Board is that: "Early in 1935, or shortly before that time, the Executive Committee of the League decided to abandon the objects set forth in sections 3 and 5 of its constitution and by-laws, quoted above, that is, those relating to legislative matters, and to limit its activities to the operation of the Mothers' Health Offices. Formal amendment to the constitution and by-laws eliminating sections 3 and 5 was not made, however, until April, 1937." Again, the Board stated: "The evidence is to the effect that these purposes, that is, to influence legislation, were abandoned at or about the time the petitioner made her contribution to the League." So far as the record discloses, the only effort made by the League in the direction of influencing legislation was its support in 1930 of a bill called the "Doctors' Bill", the purpose of which was to amend section 21 of Chapter 272 of the General Laws of Massachusetts prohibiting, generally, the sale or distribution of contraceptive devices.

Petitioner contends that whether or not a gift to the League would be deductible, the gift here was not to the League but "to or for the use of" the Mothers' Health Offices, a separate "fund" within the meaning of the statute. We find nothing in the legislative history or in the decided cases throwing light on the meaning of "fund" in this context. Apparently a non-exempt organization cannot obtain deductibility for contributions to an admittedly charitable object by setting up a separate trust fund to be applied to that object only, and soliciting contributions thereto. Davison v. Commissioner, 2 Cir., 60 F.2d 50, 51. That the "fund" must be a distinct organization is implied in the corresponding provisions of section 101(6) of the Revenue Act of 1934, 26 U.S.C.A.Int.Rev.Code, § 101(6), where the same word is used. [1]

[1] "Sec. [§] 101. *Exemptions from tax on corporations.*

"The following *organizations* shall be exempt from taxation under this title [chapter] * * *

"(6) Corporations, and any community

In this case, an effort was made to set up the Mothers' Health Offices as distinct organizations, with their own constitutions, officers and committees; and provision was made whereby contributions could be designated for the separate use of the Health Offices. The Board apparently recognized this in its finding that: "The Mothers' Health Offices, sometimes referred to hereinafter as the Health Offices, were closely affiliated *organizations* sponsored by and partially financed by the League." Later in its opinion, however, the Board implies that the Health Offices, because of their close organic relationship to the League, cannot be regarded as separate charitable entities or "funds". The Board says: "It is quite plain from the evidence of record, however, that the Health Offices were inseparable from the League itself and were in fact mere adjuncts of the League."

We are not prepared to assent to the proposition that a gift to a charitable agency, otherwise deductible, loses its deductibility merely because that agency may have been established, or indeed controlled, by a non-exempt organization. That a gift to the parent organization would not be deductible does not imply that the parent organization is an outlaw whose sponsorship of any charitable agency "taints" the latter with non-deductibility; it need only mean that the purposes and activities of the parent organization as a whole are such that in the judgment of Congress they should be conducted without public subvention. Thus, a gift to the Massachusetts Anti-Saloon League was held, in Appeal of Herbert E. Fales, 9 B.T.A. 828, not to be deductible; but it would not necessarily follow from this that if the Anti-Saloon League established a separate subsidiary organization, to operate a charitable sanitarium for the rehabilitation of indigent chronic drunkards, a gift for the use of such sanitarium would likewise not be deductible. Section 23(o) (2) provides a tax deduction founded on the public policy of encouraging the generosity of donors to charitable objects. This policy would seem to be fulfilled in allowing the deduction in the case supposed, even though the gift to the sanitarium might redound indirectly to the credit of the sponsoring organization, the Anti-Saloon League. Cf. Cochran v. Commissioner, 4 Cir., 78 F.2d 176, 179. Whether the Health Offices in the case at bar can be deemed separate entities, distinct from the parent body, the Birth Control League, presents a difficult question, particularly in view of the fact that the "Constitution" of the Brookline Mothers' Health Office itself describes the organization as a "Committee of the Birth Control League of Massachusetts". We find it unnecessary to rest our decision on this point, because we think that the League itself falls within the provisions of section 23(o) (2).

There is no contention that the League is disqualified on the ground that a substantial part of its actual current activities has been "carrying on propaganda, or otherwise attempting, to influence legislation"; the Board's finding is to the contrary, as above noted. The Board's conclusion that the League falls outside the provisions of section 23(o) (2) rests upon the finding that the League was not "organized" exclusively for the purposes enumerated in this subsection.

If, at the time of the taxpayer's gift, sections 3 and 5 had been eliminated from Article II of the League's constitution, setting forth the purposes of the League, it seems that the Board would have concluded, and properly so, that the League was organized exclusively for charitable, scientific and educational purposes,[2] apart from the point as to the illegality of the Health Offices, to be discussed later. Slee v. Commissioner, 2 Cir., 42 F.2d 184, 185, 72 A.L. R. 400. The formal amendment of the constitution by striking out sections 3 and 5 was not made until April, 1937; and the Board in effect rules as a matter of law

chest, *fund*, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." (Italics ours.)

[2] It stands admitted on the pleadings in the case at bar that on March 4, 1938, the Commissioner in a letter addressed to the Birth Control League of Massachusetts ruled that contributions to that organization were deductible under Section 23 (o) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Acts, page 829. This was after the amendment to the constitution, formally eliminating Sections 3 and 5 of the declared purposes of the League.

that an organization initially outside of section 23(o) (2) because not "organized" for purposes exclusively charitable, etc., cannot thereafter bring itself within section 23(o) (2) by anything short of a formal amendment of its constitution, eliminating the non-exempt purposes.

We do not think the statute makes so rigid a requirement, at least so far as concerns informal unincorporated associations like the one here involved. Cochran v. Commissioner, 4 Cir., 78 F.2d 176, 178. Under Article VI of the constitution of the League "the Executive Board shall have full power to determine the policies and initiate the work and activities of the Birth Control League of Massachusetts". The Board has found as a fact that "early in 1935, or shortly before that time", the Executive Committee of the League decided to abandon political or legislative objects and to limit its activities to the operation of the Mothers' Health Offices. Apparently this abandonment was acquiesced in by the common consent of the members for the reason that the League had received a legal opinion that a change in the Massachusetts statute was not necessary to legalize the operation of the Mothers' Health Offices under the guidance of licensed physicians prescribing birth control measures only to those women whose physical or mental condition indicated that further or immediate pregnancy would be perilous to health. Considering the informal way these unincorporated associations are run, we conclude that after the legislative objectives had thus been abandoned, the League ceased to be "organized" for purposes other than those set forth in section 23(o) (2). The exemption of income devoted to charity was a liberalization of the law in the taxpayer's favor "begotten from motives of public policy" and "not to be narrowly construed". Helvering v. Bliss, 293 U.S. 144, 150, 151, 55 S.Ct. 17, 20, 21, 79 L.Ed. 246, 95 A.L.R. 207.

The Government relies heavily on Slee v. Commissioner, 2 Cir., 42 F.2d 184, 72 A.L.R. 400, for the proposition that the current existence of declared non-exempt purposes in the constitution and by-laws during the taxable year inescapably takes the organization outside the provisions of the statute and consequently results in non-deductibility. As we read that case, it implies quite the contrary. The court there was dealing with a gift to the American Birth Control League. In 42 F.2d at pages 185, 186, 72 A.L.R. 400, the court says: "Indeed the charter [of the American Birth Control League] does not mention the clinic or anything of the sort; it speaks only of the League's scientific projects, its general purpose to secure the repeal of laws which deal with preventing conception, and the publication of the magazine. *This is not indeed conclusive; in practice the League might have abandoned all such efforts except as they conduced to a relief of the clinic.* The evidence passes somewhat lightly over this feature of the work, for obvious reasons, but it does not disclaim the charter, and, if it did, the Board was not obliged to conclude that the abandonment of what had been so formally declared was final." [Italics ours.]

The implication seems to be that the aims for which an association is "organized" can be redefined, at least for purposes of section 23(o) (2), without a formal amendment of the charter or constitution. In the Slee case the court held that the Board was "not obliged to conclude" that there had been an abandonment of the original stated purposes; in the case at bar we have an express finding by the Board that the legislative objects had been abandoned at the time of the gift.

As an alternative ground of decision the Board added briefly that in Commonwealth v. Gardner, 1938, 300 Mass. 372, 15 N.E.2d 222, the Mothers' Health Offices were held to be in violation of Mass.G.L., c. 272, § 21.[3] "In these circumstances", the Board said, "we think that a contribution to the Health Offices could not be allowed as a deduction under the provisions of the Federal statute. It would be contrary to public policy, if not directly contrary to the in-

---

[3] "Whoever sells, lends, gives away, exhibits, or offers to sell, lend or give away an instrument or other article intended to be used for self-abuse, or any drug, medicine, instrument or article whatever for the prevention of conception or for causing unlawful abortion, or advertises the same, or writes, prints or causes to be written or printed a card, circular, book, pamphlet, advertisement or notice of any kind stating when, where, how, of whom or by what means such article can be purchased or obtained, or manufactures or makes any such article, shall be punished by imprisonment in the state prison for not more than five years or in jail or the house of correction for not more than two and one half years or by a fine of not less than one hundred nor more than one thousand dollars."

tention of Congress, to construe the Federal taxing statute as granting privileges to taxpayers which would lend encouragement to the support of activities inimical to the laws of the several states."

The Board makes no findings of fact as to activities deemed to be illegal in the operation of the three Mothers' Health Offices which were in existence in 1935. It rests its conclusion of law as to illegality upon Commonwealth v. Gardner, supra. In that case the defendants were convicted of violating the Massachusetts statute upon their admission that they had sold and given away articles and medicine for the prevention of conception. The defendants made an offer of proof that they were employed by the North Shore Mothers' Health Office at Salem (which was not in existence at the time of the gift now in question); that they had given the contraceptive articles to patients pursuant to doctors' prescriptions in cases where the health of the patients would be endangered by further pregnancies. The court ruled that the offer of proof constituted no defense; that no exception could be read into the statute in favor of doctors' prescriptions on grounds of health. This decision is hardly conclusive on the question whether the Health Offices in Brookline, Springfield and Worcester were lawfully conducted in 1935. They could have been operated lawfully, even under the strict interpretation of the law laid down in Commonwealth v. Gardner. It cannot be assumed, in the absence of a finding of fact by the Board, that the Health Offices in existence in 1935 were engaged in selling, giving away or exhibiting contraceptive articles.

Furthermore, even if such a finding had been made, it would not necessarily follow that the deduction should be disallowed. Interpretation of the word "charitable" in a federal revenue act is a matter of federal, not local, law. Cf. Lyeth v. Hoey, 305 U.S. 188, 193, 194, 59 S.Ct. 155, 83 L.Ed. 199, 119 A.L.R. 410; Eagan v. Commissioner, 5 Cir., 43 F.2d 881, 883, 71 A.L.R. 863. Illegality aside, we have held that the League in 1935 was organized and operated exclusively for charitable, scientific and educational purposes. This being so, we find no warrant in the language of section 23(o) (2) for the conclusion that a gift to the League in that year is rendered non-deductible because some feature of the League's activities, undertaken in good faith on advice of counsel, later turns out to have been in violation of a local penal law. If a hospital had similarly dispensed contraceptive articles in its free clinic, one would scarcely have suggested that a gift to the hospital was not deductible under section 23(o) (2). That the gift was to the Birth Control League would not seem to call for a different conclusion.

Cases holding that expenditures made in payment of fines for violation of penal law cannot be deducted from gross income, are based on the view that Congress could not have intended such expenditures to be included within the meaning of "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business". Chicago, R. I. & P. R. Co. v. Commissioner, 7 Cir., 47 F.2d 990, 991; Great Northern R. Co. v. Commissioner, 8 Cir., 40 F.2d 372; Burroughs Building Material Co. v. Commissioner, 2 Cir., 47 F.2d 178. They are not controlling on the construction of section 23(o) (2).

The decision of the Board of Tax Appeals is reversed and the case remanded to the Board with directions to enter an order that there is no deficiency.